## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | } | |
| | } | |
| **v.** | } | **1:17-cr-00428-MHH-HNJ** |
| | } | |
| **JOHN WILLIS WILSON,** | } | |
| | } | |
| **Defendant.** | } | |

### MEMORANDUM OPINION AND ORDER

John Wilson is charged in a one-count indictment with possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). (Doc. 1, pp. 1-2). Mr. Wilson has asked the Court to suppress all evidence obtained as a result of what Mr. Wilson characterizes as an unconstitutional search and seizure. (Doc. 14). This opinion resolves Mr. Wilson's motion to suppress.

## I.   BACKGROUND

On July 28, 2017, at approximately 8:30 p.m., Anniston Police Department Officer James Noah Long pulled over a black Pontiac Grand Am because the driver of the vehicle made an illegal left turn. (Doc. 22, pp. 7, 9-10). The driver steered the Grand Am into a parking lot, and Officer Long pulled his patrol car behind the Grand Am. (Doc. 22, p. 42). Moments later, Officer Grant Williams arrived on the scene to assist and stopped his patrol car behind Officer Long's car. (Doc. 22, p. 10).

Officer Long got out of his patrol car and approached the front driver side window of the Grand Am. (Doc. 22, p. 16). He was armed. (Doc. 22, p. 58). Three people occupied the car -- the driver, Keithian Kemp; the rear passenger, Mr. Kemp's brother; and the front passenger, Mr. Wilson. (Doc. 22, p. 17). Officer Long gathered identification from each occupant. (Doc. 22, p. 18). Mr. Kemp had identification, but he did not have a driver's license, and he did not have proof of insurance. (Doc. 22, pp. 18, 44). Mr. Wilson had a valid driver's license. (Doc. 22, pp. 20-21). While he was near the Grand Am, Officer Long did not see or smell anything illegal. (Doc. 22, pp. 45, 54-55, 80).

Officer Long walked back to his patrol car. (Doc. 22, p. 18). He spent more than 10 minutes running the Grand Am's plates, checking to see if Mr. Wilson or the Kemps had outstanding warrants, and completing paperwork. (GX-1, File0032, 00:00-13:45).[1] The dispatcher informed Officer Long over the radio that Mr. Kemp's license was revoked and that nobody in the Grand Am had active warrants. (Doc. 22, pp. 20-21, 48).

While Officer Long was in his patrol car, Officer Williams stood beside the rear passenger door of the Grand Am and shined a flashlight into the passenger compartment to monitor the car's occupants. (GX-2, File0013, 00:00-21:53). Officer Williams was armed, but he did not unholster his gun. (Doc. 22, pp. 50-51,

---

[1] Officer Long's body camera began recording while he was calling in information to dispatch and writing citations in his patrol car. (GX-1, File0032 and File0033).

89).  About eight minutes into the stop, Mr. Wilson told Officer Williams that his (Mr. Wilson's) house was just two minutes away, stated the street name, and seemingly motioned in the direction of his house.  (GX-2, File0013, 08:12-08:27).

When he completed the paperwork relating to the traffic violation, Officer Long walked back to the Grand Am and asked Mr. Kemp to step out of the car. (GX-1, File0032, 13:47).  As Mr. Kemp got out of the car, Officer Long patted him down.  (GX-1, File0032, 13:47-14:40).  Officer Long found nothing during the pat down.

Officer Long and Mr. Kemp walked back to Officer Long's patrol car.  (GX-1, File0032, 14:40-14:51).   Officer Long gave Mr. Kemp two citations and explained that one was for driving with a revoked license and the other for driving without insurance.  Officer Long told Mr. Kemp that he was not citing him for the illegal left turn.  (GX-1, File0032, 14:51-16:44).  Officer Long also told Mr. Kemp that if he could prove to the court that he had just bought the car, perhaps by providing a copy of the bill of sale, the court would drop the insurance citation. (GX-1, File0032, 15:04-15:19).[2]  Mr. Kemp thanked Officer Long for taking it easy on him and told Officer Long that he was "alright."  (GX-1, File0032, 16:38; Doc. 22, p. 53).

Officer Long then indicated that he was about to tell Mr. Kemp something

---

[2] During the stop, Mr. Kemp explained that he bought the car earlier in the day.  He bought the car for his girlfriend.  (Doc. 22, pp. 20, 87)

that Mr. Kemp would not like, but he (Officer Long) "could do worse." (GX-1, File0032, 16:49). Officer Long explained that he could have the car towed because Mr. Kemp could not lawfully drive without a valid license or proof of insurance.[3] But instead of having the car towed, Officer Long indicated that the car could remain parked in the parking lot, and Officer Long hinted that Mr. Kemp could have someone drive the car home from the lot after he (Officer Long) left. At the suppression hearing, Officer Long acknowledged that he was being nice and did Mr. Kemp a favor by not having the Grand Am towed, and he (Officer Long) had the discretion to provide that favor. (GX-1, File0032, 17:18-17:34; Doc. 22, p. 55).

Officer Long showed Mr. Kemp a liability release form, and this exchange took place:

> Officer Long: . . . since the car doesn't have insurance on it and you're driving revoked, technically I'm supposed to tow it, all right . . . . But I'm not going to tow it, okay? You're in a parking lot. I'm going to let you leave it here, okay?
>
> Mr. Kemp: But the house is right there on that corner.
>
> . . .

---

[3] At the suppression hearing, Officer Long testified that under Alabama law, the Grand Am could not leave the lot where it was parked because "[t]here was no insurance. Alabama state law says for a vehicle to be on the roadway, it has to have insurance or proof of insurance." (Doc. 22, p. 32). Generally speaking, this is true, but Alabama law contains a grace period for newly purchased vehicles. Ala. Code § 32-7A-6(a)(2) ("[E]vidence of insurance . . . may include . . . [t]he combination of proof of purchase of the motor vehicle within the previous 20 calendar days and a current and valid insurance card issued for the motor vehicle replaced by such purchase.").

Officer Long: What this is saying is that you're going to leave this legally parked, all right? This is what this piece of paper is saying. And that anything that happens to it while it's legally parked where it is, uh, the City of Anniston is not liable, all right. Now, what you do when I leave here is up to you, but I don't want to see that car leave that spot, okay? And I'm not going to drive back around to see if you left or whatever --

Mr. Kemp: Let me ask you a question. So I'm going to ask you this, if you leave, you ain't in sight, we can --

Officer Long: I'm not going to sit here.

Mr. Kemp: [My uncle, Mr. Wilson] can come and get it and just take it to his house?

Officer Long: Yeah. Now, he can drive it. You cannot drive this car, all right?

Mr. Kemp: He going to take it -- we going to his house. You can follow us to the house.

Officer Long: I don't want to follow you to the house, okay?

Mr. Kemp: But that's where we going.

Officer Long: I got you. But what I'm saying is I cannot see this car leave this parking lot. Now, if it's gone later tonight, that's whatever.

Mr. Kemp: What if we just sit, and he get on the driver's side, and he just take it to the house?

Officer Long: That's on you.

Mr. Kemp: That's what we doing.

Officer Long: All right. All right.

Mr. Kemp: That's what we going to do.

Officer Long:  But I don't want to watch it leave, okay?

Mr. Kemp:  That's fair enough, man.

Officer Long:  All right.

Mr. Kemp:  Thank you.

(GX-1, File0032, 17:35-18:27; Doc. 25-1, pp. 7-9).

Officer Long explained the liability release form.  Mr. Kemp received a phone call and answered it while he signed the release form.  (GX-1, File0032, 18:28-18:53).  Mr. Kemp spoke on the phone for just over one minute while Officer Long remained standing in front of him.  (GX-1, File0032, 18:53-19:57). Mr. Kemp twice told the person with whom he was speaking that Officer Long gave him a break.  (GX-1, File0032, 19:17, 19:47; Doc. 22, p. 31).  Mr. Kemp told the person on the phone to meet him "at the house" because "I'm on my way home . . . .  Well, I'll be at the house.  I love you.  Bye."  (GX-1, File0032, 19:40-19:55).

Immediately after Mr. Kemp hung up, Officer Long said, "all right, man.  So . . . we're done with all that, okay?  All right.  But --".  (GX-1, File0032, 19:58-20:01).  Mr. Kemp tried to leave.  He stated:  "I'm going to tell him to drive, man, I ain't got time," and he stepped to the side of Officer Long towards the Grand Am.  (GX-1, File0032, 20:01-20:05).  Officer Long pressed on:  "Here's the question, okay?"  Mr. Kemp replied, "Yes, sir."  Officer Long asked:  "Is there anything illegal in that car?"  (GX-1, File0032, 20:03-20:06).  Mr. Kemp stopped

and said "no." (GX-1, File0032, 20:06). Officer Long asked, "you mind if I look?" Mr. Kemp replied, "no, sir. Ain't anything [inaudible]. I promise . . . ." (GX-1, File0032, 20:07-20:10). Officer Long again asked, "so it's okay if I search the car?" Mr. Kemp replied, "I mean, shit. I don't care." (GX-1, File0032, 20:14-20:16). Officer Long instructed Mr. Kemp to "hang out right here . . . [and] sit on the bumper for me." (GX-1, File0032, 20:18-20:23; *see also* Doc. 22, p. 56). While Officer Long stopped Mr. Kemp and questioned him about contraband in his car, Officer Williams remained standing at the side of the Grand Am, shining his flashlight into the car. (GX-2, File0013, 21:35-21:53).

In fact, during the entire interaction between Officer Long and Mr. Kemp at Officer Long's patrol car, Officer Williams stood beside the Grand Am and observed Mr. Kemp's brother and Mr. Wilson, shining a light into the passenger compartment of the car. (GX-2, File0013, 00:00-21:53). A few minutes after Officer Long asked Mr. Kemp to step out of the car, Mr. Wilson told Officer Williams that he was on dialysis. Officer Williams replied: "We're not going to hold you up any longer than we have to." (GX-2, File0013, 10:11-10:33).[4] A few minutes later, Mr. Wilson made a remark to Officer Williams about needing to get his pills. Officer Williams explained that "the process" took time and repeated: "We're not gonna hold you up any longer than we have to." (GX-2, File0013,

---

[4] While he was standing near Officer Long's patrol car, Mr. Kemp told Officer Long that Mr. Wilson was on dialysis. (GX-1, File0032, 17:02-17:04).

12:54-13:05). A minute after that, Mr. Wilson asked Officer Williams about the stop, and Officer Williams replied: "It could honestly be any number of things." (GX-2, File0013, 14:00-14:22).

Officer Williams testified that he believed he watched Mr. Wilson and Mr. Kemp's brother for approximately 20 minutes. (Doc. 22, p. 90). During those 20 minutes, Officer Williams did not observe anything illegal in the car. (Doc. 22, p. 92). He did not smell alcohol or marijuana. (Doc. 22, p. 92). He did not direct Mr. Wilson to keep his hands in sight or to get out of the car. (Doc. 22, p. 91). Nothing in Officer Wiliams's body camera video suggests that he had a particular concern for his safety or a sense that illegal activity was afoot in the Grand Am.

Officer Long testified that after Mr. Kemp said that he could look in the car, "[u]nless the driver revoked consent, [he] was going to search [the car] with no one in the vehicle," so he intended to remove the car's occupants. (Doc. 22, p. 57). Officer Long acknowledged that neither passenger had a choice in the matter. (Doc. 22, p. 57).

Officer Long returned to the Grand Am, ordered Mr. Kemp's brother to get out of the car, patted him down, and instructed him to wait by the patrol car with his brother. (GX-1, File0032, 20:18-20:51; Doc. 22, p. 58). Officer Williams stood with Mr. Kemp and his brother. (Doc. 22, pp. 29-30). Officer Long then opened the front passenger door and instructed Mr. Wilson to exit the car. (GX-1,

File0032, 20:57-21:13; Doc. 22, p. 60). As Mr. Wilson got out of the car, Officer Long said that he was going to search Mr. Wilson for weapons, and Mr. Wilson stated that he had a weapon. (GX-1, File0032, 21:11-21:13). Officer Long retrieved a handgun from Mr. Wilson's waist. (GX-1, File0032, 21:13-21:24). Officer Long asked if Mr. Wilson had a permit for the gun, and Mr. Wilson said that he did not. (GX-1, File0032, 21:24-21:28). Officer Long arrested Mr. Wilson. (GX-1, File0032, 21:39-21:46). When he searched the Grand Am, Officer Long found three open beer bottles. (Doc. 22, pp. 32-33).

At the suppression hearing, Officer Long could not explain why he asked to search the Grand Am. His explanations ranged from "it doesn't hurt to ask," to something "seemed out of place, and I just figured I would ask," to "I had a suspicion. I had a feeling, I guess you would call it something." (Doc. 22, pp. 29, 65, 81). With respect to the feeling, Officer Long testified, "I'm not sure what it was. I can't remember." (Doc. 22, p. 65). The following exchange occurred between counsel for the United States and Officer Long:

Q. . . . So do you ask for consent to search every car that you stop for a traffic stop?

A. No, ma'am.

Q. Why did you decide to ask for consent to search for this one?

A. Just it doesn't hurt to ask, so . . .

(Doc. 22, p. 29). Officer Long continued: "I don't remember the exact reason

what I had or why I was thinking, but I had suspicion that obviously something was -- seemed out of place, and I just figured I would ask." (Doc. 22, p. 29). Given his testimony that he does not ask for consent to search every time he stops a car and that he observed nothing illegal in the Grand Am and given his remark that it simply didn't hurt to ask to search, the Court asked Officer Long: "what was it here that caused you to ask for permission?" (Doc. 22, p. 81). Officer Long replied, "I do not remember, Your Honor." (Doc. 22, p. 81). Officer Long's report, which he completed within hours of the search, contains no explanation for the search. (Doc. 19-1).

## II.     ANALYSIS

The constitutional analysis of Mr. Wilson's suppression motion must proceed through a number of layers. The sequence of events that led to the discovery of the firearm at issue began with a lawful traffic stop; proceeded to coerced consent to search the stopped car; and ended with a pat down following an extended involuntary seizure. The discussion that follows traces the confluence of constitutional issues that arise from this series of events.

### 1.     Mr. Wilson was seized in the traffic stop.

It is undisputed that Officer Long lawfully stopped Mr. Kemp for making an improper left turn. A traffic stop is a seizure for purposes of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). It is well-

settled that as a passenger in Mr. Kemp's car, Mr. Wilson "was seized from the moment [Mr. Kemp's] car came to a halt" in the Anniston parking lot where the traffic stop took place. *Brendlin v. California*, 551 U.S. 249, 263 (2007). Officer Williams stood on the passenger side of the stopped vehicle, shining a flashlight into the passenger compartment to monitor Mr. Wilson and Mr. Kemp's brother while Officer Long handled the details of the traffic stop. That Fourth Amendment seizure of Mr. Wilson began nearly 30 minutes before the pat down that led to the discovery of the firearm at issue. For the reasons discussed below, the seizure never ended and was unconstitutional when Officer Long retrieved the gun.

2.   <u>The traffic stop ended before Officer Long asked for permission to search the car.</u>

"A seizure justified only by a police-observed traffic violation [] 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. ---, 135 S. Ct. 1609, 1612 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "On-scene investigation into other crimes [] detours from that mission." *Rodriguez*, 135 S. Ct. at 1616. "Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." *Id.*

When conducting a traffic stop, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the

traffic] stop.'" *Rodriguez*, 135 S. Ct. at 1615 (quoting *Caballes*, 543 U.S. at 408). Such inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S. Ct. at 1615. These incidental checks ensure "that vehicles on the road are operated safely and responsibly," and therefore "serve the same objective as enforcement of the traffic code" and do not unconstitutionally prolong the traffic stop. *Id.*

The officer in *Rodriguez* stopped a car that the driver was operating on the shoulder of the road. The officer gathered the driver's license, registration, and proof of insurance; performed a records check on the driver; identified the vehicle's passenger; and issued a written warning to the driver for driving on the shoulder. The officer testified that at that point, the driver and passenger "had all their documents back and a copy of the written warning. I got all the reason[s] for the stop out of the way[,] . . . took care of all the business." *Rodriguez*, 135 S. Ct. at 1613. Nevertheless, the officer continued to detain the driver and walked a drug dog around the car, even though the driver had declined the officer's request for permission for a dog sniff. Finding that a "dog sniff is not fairly characterized as part of the officer's traffic mission," the Supreme Court rejected Eighth Circuit precedent that stated that a brief extension of a traffic stop for seven or eight minutes "was only a *de minimis* intrusion on [an individual's] Fourth Amendment

rights and was therefore permissible." *Rodriguez*, 135 S. Ct. at 1613. The Supreme Court remanded the case for further proceedings to determine whether reasonable suspicion supported the extension of the traffic stop. *Id.* at 1616-17.[5]

There may be aspects of an officer's traffic mission that prolong a stop without converting a stop into an unlawful seizure. In *United States v. Vargas*, the Eleventh Circuit established that a police officer may lawfully prolong a traffic stop after issuing a citation for the traffic violation to resolve the disposition of the stopped vehicle. 848 F.3d 971, 974-75 (11th Cir. 2017). In *Vargas*, a police officer stopped a car for following too close behind another car and issued a warning for the infraction. Because neither the driver nor the passenger had a driver's license, the officer questioned them to determine how to safely and legally move the car. During this inquiry, the driver gave the officer consent to search the car. The Eleventh Circuit found that even though the police officer continued to detain the driver after he issued the warning ticket, the officer did not unlawfully

---

[5] The law enforcement officer wanted to have his dog sniff the car in part because when the officer approached the car, "he smelled an 'overwhelming odor of air freshener coming from the vehicle,' which is, in his experience, 'a common attempt to conceal an odor that [people] don't want . . . to be smelled by the police.' App. 20-21. He also observed, upon approaching the front window on the passenger side of the vehicle, that Rodriguez's passenger, Scott Pollman, appeared nervous. Pollman pulled his hat down low, puffed nervously on a cigarette, and refused to make eye contact with him. The officer thought he was 'more nervous than your typical passenger' who 'do[esn't] have anything to worry about because [t]hey didn't commit a [traffic] violation.' *Id.* at 34." *Rodriguez*, 135 S. Ct. at 1622 (Thomas, J., dissenting). There is no such evidence in this case. The district court in *Rodriguez* adopted the magistrate judge's finding that the dog sniff "was not independently supported by individualized suspicion." *Rodriguez*, 135 S. Ct. at 1616. Neither the Supreme Court nor the court of appeals reviewed this aspect of the district court's constitutional analysis.

prolong the traffic stop. *Vargas*, 848 F.3d at 875. The Eleventh Circuit explained that "[p]reventing them from driving off without a license is lawful enforcement of the law, not unlawful detention. What prolonged the stop was not [the officer's] desire to search the vehicle but the fact that both occupants of it could not lawfully drive it away." *Id.* at 974-75.

Here, as in *Vargas*, Officer Long's traffic mission did not end when he gave Mr. Kemp two traffic citations. Because Mr. Kemp did not have a valid driver's license, Officer Long had to resolve the disposition of the Grand Am; Mr. Kemp could not operate it. But unlike *Vargas*, Officer Long resolved the disposition of the car before he asked for permission to search. After Officer Long gave Mr. Kemp the two traffic citations, Officer Long instructed Mr. Kemp that the Grand Am would have to stay parked in the Social Security lot (at least until the police officers left the lot), but Officer Long indicated that the vehicle's occupants were free to leave.[6] When Mr. Kemp signed a form releasing the City of Anniston from liability for the car, Officer Long's traffic mission was complete. Officer Long had fully investigated and resolved the illegal left turn, performed every incidental

---

[6] The United States argues that driving the uninsured car away from the parking lot would have been "against the officer's direction." (Doc. 24, p. 6). The record contradicts the argument. Officer Long clearly indicated to Mr. Kemp that someone other than Mr. Kemp could drive the Grand Am away after Officers Long and Williams left the parking lot. The body camera footage speaks for itself. (GX-1, File0032, 17:35-18:27; *see* pp. 4-6 above, transcribing the discussion between Officer Long and Mr. Kemp). During the suppression hearing, Officer Long confirmed that he told Mr. Kemp that the car could leave the lot later that night. (Doc. 22, p. 55).

safety check, and finalized the disposition of the car.  He even said so, stating to Mr. Kemp: "So we're done with all that, okay?  All right."  (GX-1, File0032, 19:58-20:01).  At the suppression hearing, Officer Long acknowledged that at that point, he completed his traffic mission.  (Doc. 22, p. 55).  Officer Long had no traffic reason to prolong the stop.  But he did, and Mr. Wilson remained seized as a result.

### 3.    The traffic stop did not become a consensual encounter.

A consensual encounter between a citizen and a police officer does not implicate the Fourth Amendment.  *United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006).  A *Terry* traffic stop shifts from a Fourth Amendment seizure to a consensual encounter "'if a reasonable person would feel free to terminate the encounter.'"  *United States v. Ramirez*, 476 F.3d 1231, 1238 (11th Cir. 2007) (quoting *United States v. Drayton*, 536 U.S. 194, 201 (2002)).

"There is no bright-line 'litmus test' for whether a traffic stop is a seizure or is a consensual encounter."  *Ramirez*, 476 F.3d at 1240 (quoting *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996)).  Instead, a district court examines the totality of the circumstances in determining whether a reasonable person would feel free to terminate the encounter.  *Ramirez*, 476 F.3d at 1240.  "Among other things," a court considers "'whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the

length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect[;] and the language and tone of voice of the police.'" *Perez*, 443 F.3d at 778 (quoting *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991)).  A district court "does not apply these factors rigidly," and "[t]he ultimate inquiry remains whether a person's freedom of movement was restrained by physical force or by submission to a show of authority."  *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).  The government bears the burden of proving that an encounter was consensual.  *Jordan*, 635 F.3d at 1186.

In *Ramirez*, the Eleventh Circuit considered whether a traffic stop had shifted to a consensual encounter before a citizen gave consent to search his car. There, police officers stopped a motorist for failing to maintain lane on an interstate.  Officers gathered the driver's license and registration; questioned the driver about his vehicle and his travel plans; checked the validity of the driver's license; ran a background check on the driver; and issued a warning citation for the traffic violation.  The officers gave the driver the warning citation, returned the driver's license and registration, and advised the driver that "the traffic stop [was] over."  *Ramirez*, 476 F.3d at 1234.  Afterwards, but "almost simultaneous[ly]," an officer asked the driver if he was carrying anything illegal in the car.  *Id.* at 1239.

The driver responded by volunteering that the officer could search the car, and the driver signed a consent to search form after the officer explained the substance of the form. *Id.* at 1234.

The Eleventh Circuit found that a reasonable person in the driver's circumstances would have felt free to terminate the encounter after he received his documentation and the warning citation. *Ramirez*, 476 F.3d at 1240. The Eleventh Circuit relied "not only on the fact that [the driver] had received all of his documentation and thus had everything he needed to proceed on his way, but also that his follow-up discussion with [the officer] appears, from the videotape of the event, to have been fully cooperative and non-coercive." *Id.* Accordingly, the Eleventh Circuit found that the *Terry* traffic stop had shifted to a consensual encounter before the driver gave consent to search. *Id.*

The United States argues that, as in *Ramirez*, the encounter following the traffic stop in this case was consensual because Officer Long "did not retain [Mr. Kemp's] identification, vital documents, or other items without which [Mr. Kemp] could not reasonably leave. Instead, [Officer Long] had given [Mr. Kemp] the citations and explained how the vehicle would be handled. [Officer Long] had been extremely polite to [Mr. Kemp] throughout the encounter, and [Mr. Kemp] even could be heard complimenting [Officer Long's] demeanor on the video." (Doc. 24, pp. 8-9) (footnote omitted).

The United States omits important details that distinguish this case from *Ramirez*. From the inception of the traffic stop until Mr. Kemp gave consent to search, just a short distance from Mr. Kemp, Officer Williams stood directly behind the rear passenger side door of the Grand Am, shining a flashlight into the passenger compartment to monitor the occupants of the car. (GX-2, File0013, 00:00-21:53). Officer Williams was armed; he did not brandish his gun. When Officer Long completed his traffic mission, Officer Williams did not step away from the car. Instead, he maintained control over the car and its occupants.

When Mr. Kemp ended his phone call, he was under the impression that he soon would be free to leave. He ended the call stating, "I'm on my way home . . . I'll be at the house. I love you. Bye." (GX-1, File0032, 19:40-19:55). And Mr. Kemp tried to leave, but Officer Long stopped him. As soon as Mr. Kemp hung up the phone, Officer Long said, "all right, man. So we're done with all that, okay? All right," and then seamlessly began questioning Mr. Kemp about illegal contraband. (GX-1, File0032, 19:58-20:06; Doc. 25-1, pp. 11-12). Mr. Kemp said "I ain't got time" and stepped towards his car. (GX-1, File0032, 20:01-20:05). But Officer Long persisted, continuing his questioning. And Officer Williams maintained his post at the Grand Am.

While he questioned Mr. Kemp, Officer Long's tone of voice was calm and

non-combative.[7]  Initially, Mr. Kemp answered Officer Long's questions about contraband respectfully, but as Officer Long pressed him, finally asking, "so it's okay if I search the car," Mr. Kemp replied in a frustrated tone, "I mean, shit.  I don't care."  (GX-1, File0032, 20:14-20:16).  Officer Long's conduct and Officer Williams's conduct clearly communicated to Mr. Kemp and to the two occupants of the Grand Am that none of them was free to leave.  Officer Long's tone was calm, but his display of authority was plain.  Neither officer advised Mr. Kemp of his right to refuse consent and walk away.  And neither officer told Mr. Wilson that he was free to leave.[8]

The circumstances following the conclusion of Officer Long's traffic mission were coercive, and the traffic stop did not shift to a consensual encounter.  Similarly, under the totality of the circumstances, Mr. Kemp's "consent" to search (assuming without deciding that the statement -- "I mean, shit.  I don't care." -- is a statement of consent) was not voluntary.  Generally, consent is voluntary if it is "the product of an essentially free and unconstrained choice."  *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir. 1989); *see also United States v. Cusick*, 559

---

[7] Officer Long and Officer Williams both maintained an even tone of voice throughout their interaction with the three occupants of the Grand Am.

[8] The Court recognizes that as a general rule, to prove that consent is valid, the United States does not have to demonstrate that an officer told an individual that he "was free to go."  *Ohio v. Robinette,* 519 U.S. 33, 39-40 (1996).  But "'knowledge of the right to refuse consent is one factor to be taken into account'" in determining whether consent is valid.  *Ohio*, 519 U.S. at 39 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 231 (1973)); *see also United States v. Cusick*, 559 Fed. Appx. 790, 792 (11th Cir. 2014).

Fed. Appx. 790, 792 (11th Cir. 2014) ("Searches conducted by means of consent are valid as long as the consent is voluntary.") (citing *United States v. Kapperman,* 764 F.2d 786, 793 (11th Cir. 1985)). Mr. Kemp's "consent" was not the product of free choice.

4. <u>Officer Long lacked reasonable suspicion to continue the stop and probable cause to search the Grand Am.</u>

Because the interaction between Officers Long and Williams, on the one hand, and the Grand Am's three occupants on the other, did not become consensual at the conclusion of the traffic stop, under *Rodriguez*, the officers could continue the stop only on the basis of reasonable suspicion.[9] Because Mr. Kemp's "consent" to search was not voluntary and because Officer Long did not have a search warrant, Officer Long could search the Grand Am only if he had probable cause to believe that he would find evidence of a crime in the car.[10] If Officers Long and Williams lacked reasonable suspicion to prolong the seizure of the Grand Am's occupants, then Officer Long, as a matter of law, lacked probable cause to search the Grand Am. *United States v. Reed*, 402 Fed. Appx. 413, 415 (11th Cir.

___

[9] *Rodriguez*, 135 S. Ct. at 1616 (remanding for appellate review of district court's finding that the defendant's continued seizure after completion of traffic stop was not supported by reasonable suspicion); *United States v. Hunter*, 291 F.3d 1302, 1305-06 (11th Cir. 2002) ("The Supreme Court has instructed that an officer may conduct a brief, warrantless, investigatory stop of an individual when the officer has a reasonable, articulable suspicion that criminal activity is afoot, without violating the Fourth Amendment.") (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

[10] *Cusick*, 559 Fed. Appx. at 792; *United States v. Hogan*, 684 Fed. Appx. 904, 907 (11th Cir. 2017) ("Probable cause to search exists when, 'under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting *United States v. Thomas*, 818 F.3d 1230, 1234 (11th Cir. 2016)).

2010) ("On a level-of-suspicion spectrum, 'reasonable suspicion' is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and even falls below the probable cause standard of 'a fair probability that contraband or evidence of a crime will be found.'") (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)).

"An 'inchoate and unparticularized suspicion or hunch of criminal activity' is not sufficient to meet the reasonable suspicion standard." *United States v. Lopez-Garcia*, 565 F.3d 1306, 1313 (11th Cir. 2009) (quoting *United States v. Yuknavich,* 419 F.3d 1302, 1311 (11th Cir. 2005)). "Rather, an 'officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" *Id.*; *see also Hogan*, 684 Fed. Appx. at 907 (explaining that a brief investigatory stop "must be justified by 'reasonable, articulable suspicion based on objective facts . . . .'") (quoting *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010)).

Reasonable suspicion is based on the totality of the circumstances. *Reed*, 402 Fed. Appx. at 415. An officer must assess those circumstances "in light of his professional experience." *Id.* (internal marks and citation omitted).

> The Supreme Court has identified several factors that might affect officers' reasonable suspicion calculus. For instance, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow,* 528 U.S. at 124, 120 S. Ct. at 676. For that reason, "the fact that the stop occurred in a 'high

crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id.* Additionally, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* So too, a bulge in one's outer clothing might indicate the presence of contraband or a weapon. *See Pennsylvania v. Mimms,* 434 U.S. 106, 112, 98 S. Ct. 330, 334, 54 L. Ed. 2d 331 (1977).

*Reed*, 402 Fed. Appx. at 415-16.

As recounted above, at the suppression hearing, when counsel for the United States asked Officer Long why he wanted to continue the stop and search the Grand Am, his explanation amounted, at best, to an unparticularized hunch.

> Q. . . . So do you ask for consent to search every car that you stop for a traffic stop?

> A. No, ma'am.

> Q. Why did you decide to ask for consent to search for this one?

> A. Just it doesn't hurt to ask, so . . .

(Doc. 22, p. 29). Officer Long continued: "I don't remember the exact reason what I had or why I was thinking, but I had suspicion that obviously something was -- seemed out of place, and I just figured I would ask." (Doc. 22, p. 29).

The objective facts known to Officer Long were these: Mr. Kemp committed two traffic violations by driving with a revoked license and operating a vehicle in which there was no proof of insurance. Officer Long knew that Mr. Kemp likely would be able to resolve the insurance issue in court. He knew that none of the vehicle's occupants had outstanding warrants. He knew that the traffic

stop took place in a commercial area in the City of Anniston at approximately 8:30 p.m. on a rainy July evening.  (Doc. 19-1, p. 1; Doc. 22, pp. 10-11, 41-42).[11] When he approached the Grand Am and first interacted with the vehicle's occupants, he did not see or smell anything that suggested criminal activity.[12] When he asked Mr. Kemp to step out of the car, Mr. Kemp cooperated, and when Officer Long patted down Mr. Kemp, he found no weapon.  Mr. Kemp cooperated throughout the traffic stop and thanked Officer Long for giving him a break.  The other occupants of the Grand Am cooperated with Officer Long.  (Doc. 22, p. 45). Officer Long knew that for the duration of the 20+ minute traffic stop, Officer Williams had stood beside the Grand Am, shining his flashlight into the passenger cabin, and Officer Williams had not signaled concern about his safety or indicated that he had seen evidence of criminal conduct.  (Doc. 22, p. 51).[13]  Officer Long knew that neither he nor Officer Williams felt compelled to call for back-up during the traffic stop.  (Doc. 22, p. 46).

---

[11] At the suppression hearing, counsel for the United States asked Officer Long about two neighborhoods approximately one mile from the shopping center where the traffic stop occurred. The Anniston Housing Authority operates the housing facilities in those neighborhoods, and Officer Long reported that those two neighborhoods are high crime areas.  (Doc. 22, pp. 11-12). On cross-examination, Officer Long acknowledged that the federal courthouse in Anniston is also approximately one mile from the shopping center.  (Doc. 22, p. 68).

[12] During the suppression hearing, Officer Long acknowledged that he probably would have removed all of the occupants of the Grand Am immediately if he had seen anything suspicious while he was near the vehicle.  (Doc. 22, pp. 45-46).

[13] Officer Long testified that Officer Williams stood beside the Grand Am to "watch what's going on inside the vehicle."  (Doc. 22, p. 18).

If, at the beginning of the traffic stop, Officer Long had entertained the possibility that the Grand Am was stolen -- because Mr. Kemp lacked the documentation that an officer ordinarily would expect to find in a car and because Mr. Kemp was driving with a revoked license -- by the completion of the traffic stop, Officer Long obviously was satisfied that the car was not stolen, not only because he had checked twice to make certain that the Grand Am had not been reported stolen and Mr. Kemp had explained that he and his girlfriend had just bought the car (Doc. 22, p. 20), but also because he (Officer Long) had decided not to have the car towed, an option that he believed was available to him because of the absence of proof of insurance. Officer Long even communicated to Mr. Kemp that he (Mr. Kemp) could have Mr. Wilson drive the Grand Am home as long as neither he (Officer Long) nor Officer Williams saw the car leave the lot where it was parked.[14] Within hours of his encounter with Mr. Kemp, Officer Long wrote

---

[14] The Court has reviewed Officer Long's recording of the traffic stop multiple times to try to make sense of Officer Long's willingness, on the one hand, to let Mr. Kemp retain possession of the Grand Am (with the help of a licensed driver) and Officer Long's determination, on the other hand, to search the car, an exercise that Officer Long should pursue only if objective facts indicated that the car contained evidence of criminal conduct. To reconcile these seemingly contradictory positions, the Court has considered whether Officer Long believed Mr. Kemp, concluded that the car was not stolen, and (because he had less than one year of experience at the time) asked for permission to search because, in Officer Long's words, "it doesn't hurt to ask." The Court also considered whether Officer Long did not believe Mr. Kemp and spun the tale about avoiding towing and leaving the car in the parking lot to secure Mr. Kemp's trust and cajole consent to search. Officer Long's testimony at trial was credible, so the Court has decided to accept the former explanation for Officer Long's inconsistent conduct. If the Court is mistaken, and Officer Long intentionally led Mr. Kemp to believe that he would be able to take the Grand Am home only to coerce consent to search, then

nothing in his report of the encounter that constitutes articulable suspicion of criminal conduct. (Doc. 19-1).

Intermittently during his testimony during the suppression hearing, Officer Long indicated that he decided to search the Grand Am because one of his colleagues was killed during a traffic stop, so he understands that traffic stops are dangerous. (*See*, *e.g.*, Doc. 22, pp. 78-79). This explanation makes no sense because Officer Long testified that he does not always search vehicles during traffic stops, even traffic stops at night, and he does not always ask the occupants of a vehicle to exit the vehicle during a traffic stop. (Doc. 22, p. 78). Moreover, Officer Long did not pursue a search during the traffic mission. Instead, he waited until the traffic mission was over to ask for permission to search. If he was concerned about safety while he executed his traffic mission, then he should have pursued a search of the Grand Am early in the stop. In response to a direct question from the Court about his assessment of the danger that Mr. Kemp and the vehicle occupants presented during the traffic mission, Officer Long honestly reported: "No, Your Honor, I did not believe that they were armed at the time, or I had no reason to believe they were armed at the time." (Doc. 22, p. 79). The

---

Officer Long's failure to advise Mr. Kemp that he did not have to consent to the search request renders the search unconstitutional. *See United States v. Burwell*, 1:17-cr-00471-MHH-TMP.

Court credits Officer Long's initial explanation for his decision to try to search the car; he asked for permission to search because "it doesn't hurt to ask."[15]

Prolonging a traffic stop because "it doesn't hurt to ask" to search the vehicle that officers stopped does not meet the reasonable suspicion threshold. The "it doesn't hurt to ask" standard is not even "unparticularized suspicion." At best, Officer Long had a hunch. The totality of the circumstances surrounding the extension of the traffic stop in this case does not give rise "to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Yuknavich,* 419 F.3d at 1311 (internal quotation marks omitted); s*ee* pp. 22-23 above. The extended stop is not supported by reasonable suspicion, and the vehicle search is not supported by probable cause. The extended seizure and vehicle search are unconstitutional.

> 5.    Officer Long unconstitutionally seized Mr. Wilson by prolonging the stop.

Mr. Wilson lacks standing to challenge the search of the Grand Am directly. "[A] defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United*

---

[15] Officer Long had been an officer for less than a year when he conducted the traffic stop at issue. The Court appreciates Officer Long's candor at the suppression hearing and understands that law enforcement officers have to make difficult judgments on a daily basis. As the Court stated above, an officer must assess the totality of the circumstances "in light of his professional experience." *See* p. 21 above. Logically, that may be a challenging task for new officer.

*States v. Padilla*, 508 U.S. 77, 81 (1993) (emphasis in original). Whether a defendant's own Fourth Amendment rights were violated depends on "whether [the defendant] has a constitutionally protected reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 211 (1986). The Supreme Court has held that "mere[] passengers" of a car who "assert neither a property nor a possessory interest in the [car]" generally do not have a legitimate expectation of privacy in the car. *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978). Therefore, passengers like Mr. Wilson typically cannot challenge the fruits of an unlawful search of the car in which they are riding as a passenger. *Id.*

But Mr. Wilson does not seek to suppress evidence found in the Grand Am. He asks the Court to suppress evidence found on his person during a pat down conducted pursuant to the illegal search of the Grand Am. Mr. Wilson contends that Officers Long and Williams, in violation of his (Mr. Wilson's) Fourth Amendment rights, seized his person and conducted a pat down search. *See Brendlin*, 551 U.S. at 253 ("[The passenger] did not assert that his Fourth Amendment rights were violated by the search of [the driver's] vehicle, *cf. Rakas v. Illinois*, 439 U.S. 128 . . . (1978), but claimed only that the traffic stop was an unlawful seizure of his person."). The United States acknowledges that Mr. Wilson has standing to challenge the pat down. (Doc. 24, p. 2, n. 1) ("[Mr.] Wilson clearly has standing to challenge the search of his own person. Under the

unique facts of this case, it seems unlikely Defendant Wilson ever would have been asked to get out of the car or searched upon exit of the vehicle absent preparation to search the car.").

As a passenger in a car stopped for a traffic violation, Mr. Wilson was seized for purposes of the Fourth Amendment "[f]or the duration of [the] traffic stop." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). When Officer Long completed his traffic mission, the stop became an unreasonable seizure of Mr. Wilson's person.

In *Brendlin*, the Supreme Court explained why an officer conducting a traffic stop seizes everyone in the car:

> A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road, and the police activity that normally amounts to intrusion on privacy and personal security does not normally (and did not here) distinguish between passenger and driver. An officer who orders one particular car to pull over acts with an implicit claim of right based on fault of some sort, and a sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing. If the likely wrongdoing is not the driving, the passenger will reasonably feel subject to suspicion owing to close association; but even when the wrongdoing is only bad driving, the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place.

*Brendlin*, 551 U.S. at 257 (internal citations and quotation marks omitted). In addition, because "during a lawful traffic stop an officer may order a passenger out of the car as a precautionary measure, without reasonable suspicion that the

passenger poses a safety risk," there is a reasonable "societal expectation of 'unquestioned [police] command' at odds with any notion that a passenger would feel free to leave, or to terminate the personal encounter any other way, without advance permission." *Id.* at 258 (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)) (internal quotation marks omitted) (alteration in original).

Pursuant to *Brendlin*, simply because of his status as a passenger in a stopped vehicle, Mr. Wilson was seized at all times. The officers restrained both Mr. Kemp and his passengers during the traffic stop "through means intentionally applied." *Brendlin*, 551 U.S. at 254 (internal quotation marks omitted). The traffic stop "necessarily curtail[ed] the travel [Mr. Wilson had] chosen just as much as it halt[ed Mr. Kemp]." *Id.* at 257. At no point until Officer Long arrested Mr. Wilson did either Officer Long or Officer Williams "distinguish between passenger and driver" or separately seize the passengers for any reason besides the resolution of the traffic stop with Mr. Kemp. *Id.*

Independent of his status as a passenger, Mr. Wilson was seized at all times because he was never free to leave. Officer Williams, who was armed, stood by the Grand Am and monitored Mr. Wilson and Mr. Kemp's brother with a flashlight while Officer Long talked with Mr. Kemp by the patrol car. Mr. Wilson was seated in the "physical focal point of an investigation into faulty behavior or wrongdoing." *Brendlin*, 551 U.S. at 257. Even though Mr. Wilson did not commit

the traffic violation, like all passengers in a stopped vehicle, he expected to be "subject to some scrutiny." *Id.* Three times, Mr. Wilson spoke to Officer Williams, explaining that he was on dialysis and asking about the traffic stop. Each time, Officer Williams told Mr. Wilson that he was being held pursuant to the traffic stop. *See* pp. 7-8 above. Mr. Wilson saw Officer Long order Mr. Kemp out of the car and pat him down. Officer Long kept Mr. Kemp out of the car. Clearly, Mr. Wilson exiting the Grand Am on his own free will would "prompt an objection from the officer[s]." *Brendlin*, 551 U.S. at 257.

And Mr. Wilson was most obviously not free to leave when Officer Long began his search of the Grand Am. When Officer Long returned to the Grand Am, he instructed Mr. Kemp's brother to exit the car and patted him down. Officer Long then turned his attention to Mr. Wilson. Officer Long testified that he would not allow Mr. Wilson to refuse a pat down. As Officer Long confirmed, "[Mr. Wilson] didn't exactly have a choice" and "was getting out of [the Grand Am] either way." (Doc. 22, p. 60). Officer Long acknowledged that neither passenger in the Grand Am exited the car voluntarily; they got out of the car because Officer Long instructed them to do so. (Doc. 22, pp. 57, 60). And Officer Long acknowledged that the passengers had no option with respect to a pat-down search. (Doc. 22, pp. 58, 62).

Because Mr. Wilson unquestionably was seized at all times, the Court must

determine whether the officers had reasonable and articulable suspicion that Mr. Wilson was breaking the law to justify the seizure under the Fourth Amendment. *See Heien v. North Carolina*, 574 U.S. ---, 135 S. Ct. 530, 536 (2014); *Terry*, 392 U.S. at 30. The officers did not.

The seizure of Mr. Wilson became unreasonable after Officer Long completed his traffic mission. Mr. Wilson's seizure is inextricably linked to Mr. Kemp's seizure. When Officer Long completed his traffic mission, for the reasons discussed above, he should have allowed Mr. Kemp and his passengers to leave. When Officer Long prolonged Mr. Kemp's detention, he also prolonged the seizure of Mr. Kemp's passengers. The prolonged seizure therefore violated Mr. Wilson's Fourth Amendment rights, unless the officers had reasonable and articulable suspicion to justify an independent seizure of Mr. Wilson, separate and apart from the seizure of Mr. Kemp. They did not.

Officer Williams monitored Mr. Wilson and Mr. Kemp's brother for 20 minutes and did not observe evidence of criminal activity or smell alcohol or marijuana. (Doc. 22, pp. 90-92). Officer Williams testified that Mr. Wilson was cooperative. (Doc. 22, p. 91). Although Officer Williams stated that "[b]ased on the vehicle position, [he] had very poor vision on Mr. Wilson" (Doc. 22, p. 91), Officer Williams's body camera footage shows that Mr. Wilson simply sat in the Grand Am while Officer Long talked with Mr. Kemp. (GX-2, File0013, 00:00-

21:53).  As discussed above, the record contains no evidence that suggests that either Officer Long or Officer Williams suspected Mr. Wilson of criminal conduct or believed that Mr. Wilson was a threat.[16]

6.      The gun is the fruit of the illegal seizure of Mr. Wilson.

Generally, under the "fruit of the poisonous tree" doctrine, evidence obtained as a direct result of an illegal search or seizure must be suppressed. *United States v. Timmann*, 741 F.3d 1170, 1182 (11th Cir. 2013).  When deciding a motion to suppress, the Court "examines the extent of the causal connection between the lawless police conduct and the evidence in question." *United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982).  This inquiry "generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response." *Id.*  Even if a defendant establishes that he was the victim of an unlawful seizure, evidence against him may be admissible if it is obtained "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

Accordingly, "[t]hree general exceptions to the fruit of the poisonous tree doctrine have been developed, under which the government may break that causal chain" between the unlawful police conduct and the evidence sought to be

---

[16]    At the time of his arrest, Mr. Wilson was 53 years old.  As both Officer Long and Officer Williams had been told, Mr. Wilson was on dialysis.  (Doc. 19-1, p. 3).  It is extremely unlikely any officer would view Mr. Wilson as a threat.

suppressed.  *Timmann*, 741 F.3d at 1182.  First, "intervening events or circumstances independent of the primary illegality may have so attenuated the causal connection as to dissipate the taint of the unlawful police action."  *Bailey*, 691 F.2d at 1013.  Second, "the government may use evidence that it has obtained in fact from a source independent of the primary illegality."  *Id.*  Third, "evidence may be admissible if the government inevitably would have discovered it without the aid of the unlawful police conduct."  *Id.*

"[A]n act by a defendant, which may in some sense be considered 'voluntary,'" does not "necessarily break the causal chain."  *Bailey*, 691 F.2d at 1013.  For example, "even a voluntary confession will be suppressed if it is the product of an unlawful arrest and custodial detention."  *Id.*  The Eleventh Circuit "recognize[s] several factors which are relevant to determining whether the defendant's behavior was a product of the illegal police action.  These include the temporal proximity of the arrest and the defendant's response, the presence or absence of intervening circumstances, and the purpose and flagrancy of the official misconduct."  *Timmann*, 741 F.3d at 1183.

Here, the unlawful seizure of Mr. Wilson caused Officer Long to retrieve the handgun through an unbroken chain of events.  Mr. Wilson was unconstitutionally seized after Officer Long completed his traffic mission because Officer Long prolonged the detention without reasonable suspicion.  Officer Williams initially

carried out the unreasonable detention of Mr. Wilson until Officer Long took over. Because Mr. Kemp's "consent" to search was not voluntary and because the totality of the circumstances did not give rise to probable cause to search the Grand Am, Officer Long had no lawful reason, after he completed his traffic mission, to direct the occupants of the Grand Am to step out of the car for a pat down. As stated, the United States concedes the point. *See* pp. 27-28 above. No event or circumstance broke the causal connection between the unlawful seizure and Officer Long's discovery of the gun. The gun did not arise from an independent source. Officer Long would not have inevitably found the gun without the unlawful seizure.

Mr. Kemp's consent was not an intervening circumstance because it was tainted by the same illegality as the seizure of Mr. Wilson, that is, Officer Long's desire to search the Grand Am because "it doesn't hurt to ask." Mr. Wilson's statement that he had a weapon also did not break the chain of causation. Mr. Wilson only said that he had a weapon because of the imminent pat down. Officer Long already had patted down Mr. Kemp and Mr. Kemp's brother and said that he was going to search Mr. Wilson for weapons. Mr. Wilson simply communicated what Officer Long inevitably would find in the mandatory pat down. Mr. Wilson did not volunteer the information independent of the unlawful seizure. Mr. Wilson's statement was the direct product of the impending pat down that was the

direct product of the coerced consent to search that was the direct product of the unlawful seizure following the completion of the traffic mission.

Accordingly, the gun is the fruit of the unconstitutional search and seizure of Mr. Wilson. Therefore, the Court suppresses the gun.

## III. CONCLUSION

Based on the foregoing, the Court **GRANTS** Mr. Wilson's motion to suppress. The United States may not use evidence obtained as a result of the search and seizure of Mr. Wilson.

**DONE** and **ORDERED** this 16th day of July, 2018.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE